AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| In the Matter of the Search of | | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) ) ) | Case No. **21 MR 1279** |
| 5309 Territorial Road NW, Albuquerque, New Mexico 87120 | | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Distribution and possession with intent to distribute controlled substances; conspiracy to do the same |
| 21 U.S.C. § 856 | Maintaining a drug-involved premises |

The application is based on these facts:

The affidavit of Special Agent Gillian M. Polinko is incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Gillian Polinko*
*Applicant's signature*

Gillian M. Polinko, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephonically sworn and electronically signed__ *(specify reliable electronic means)*.

Date: __9/7/2021__

*Steve Yarbrough*

City and state:  Albuquerque, New Mexico

Steven C. Yarbrough, United States Magistrate Judge
*Printed name and title*

### AFFIDAVIT IN SUPPORT OF
### APPLICATION FOR SEARCH WARRANTS

I, Gillian M. Polinko, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for warrants to search certain properties identified in this affidavit,

hereinafter referred to collectively as the "**SUBJECT PREMISES**," as more fully described in

Attachments A for the items described in Attachments B:

| | |
|---|---|
| **Manning's Residence**<br>614 ½ Noble Place NE<br>Albuquerque, New Mexico 87107 | **Garcia's Residence**<br>5309 Territorial Road NW, Albuquerque, New Mexico 87120 |
| **Canyon Vista Stash Location**<br>Canyon Vista Apartments[1]<br>3958 Montgomery Blvd NE, Apt 86,<br>Albuquerque, New Mexico 87109 | **Del Rio Stash Location**<br>Del Rio Apartments<br>4601 Montano Road NW, Apt 107,<br>Albuquerque, New Mexico 87120 |
| **Manning's Storage**<br>RightSpace Storage<br>4620 Pan American East Freeway NE, Unit<br>C29,  Albuquerque, New Mexico 87109 | |

### AGENT BACKGROUND AND EXPERIENCE

2.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and I

am an "investigative or law enforcement officer" of the United States within the meaning of 18

U.S.C. § 2510(7), in that I am an officer of the United States empowered by law to conduct

criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.  I have

been employed with the DEA since April 2019 and am currently assigned to the El Paso Field

Division, Albuquerque District Office. Prior to being a Special Agent with the DEA, I worked as

---

1 On July 30, 2021, agents observed a new sign in front of the apartment complex where **Canyon Vista Stash Location** is located. The apartment complex, previously known as the Villas Del Sol III Apartments, was now Canyon Vista Apartments. Prior to July 30, 2021, DEA reports refer to this location as Villas Del Sol III Apartments.

an intelligence analyst for the High Intensity Drug Trafficking Area ("HIDTA") program, where I supported multiple DEA, state, and local narcotics investigations.

3.      I graduated from the DEA Academy in Quantico, Virginia, where I received approximately 16 weeks of specialized narcotics-related training. The training included controlled substance identification, narcotics related investigative techniques, interview and interrogation training, preparation of search warrants, tactical applications of narcotics enforcement, surveillance and electronic monitoring techniques, money laundering investigations and various forensic subjects, including latent fingerprint collection and analysis. As a DEA Special Agent and prior Intelligence Analyst, I have participated in numerous investigations of individuals and organizations trafficking cocaine, cocaine base ("crack"), marijuana, methamphetamine, fentanyl,  and other controlled substances as defined in 21 U.S.C. § 801.  My experience as a Special Agent includes, but is not limited to, conducting surveillance, interviewing witnesses, participating in arrests, searches, and seizures, working in an undercover capacity and working with informants, and investigating money laundering cases. I have received training in the investigation of violations of federal and state drug and money laundering laws. As a result, I am familiar with matters including, but not limited to, the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions. I also have experience in analyzing and interpreting drug codes used by drug traffickers. The interpretations of words and phrases included below are based upon mine and other agent's training and experience, in addition to the context provided by other calls and supplemental investigation.

## BACKGROUND OF INVESTIGATION

4.      I am a case agent on this investigation targeting the Leonardo GARCIA drug

trafficking organization ("DTO") and others, based in Albuquerque, New Mexico ("NM"). The

investigation of the GARCIA DTO employed a number of investigative techniques, including a

confidential source ("CS"), physical surveillance, court authorized Global Positioning System

("GPS") cellular phone location information, and pole cameras. The investigative efforts of the

Drug Enforcement Administration ("DEA") and the Federal Bureau of Investigation ("FBI")

have revealed a narcotics trafficking organization run by the GARCIA DTO.

5.      The investigation revealed several members and affiliates of the GARCIA DTO,

including Leonardo Garcia, Jeffrey Manning, John Allison Jr., Derek Baca, and others known

and unknown ("**THE SUBJECTS**"). Through this investigation, agents learned that Jeffery

Manning ("Manning") was one of the main distributors for Leonardo Garcia ("Garcia").  Agents

further learned that the GARCIA DTO maintained three suspected locations where the DTO

stores illegal drugs, drug proceeds, and/or items used to facilitate the DTO's activities. These

locations will hereinafter be referred to as "stash locations."[2]  One stash location is located at the

Canyon Vista Apartments, 3958 Montgomery Boulevard NE, Apartment 86, Albuquerque, NM

**("Canyon Vista Stash Location")**. The second stash location is located at the Del Rio

Apartments, 4601 Montano Road NW, Apartment 107, Albuquerque, NM ("**Del Rio Stash**

**Location**"). The third stash location is located at the RightSpace Storage, 4620 Pan American

East Freeway NE, Unit C29, Albuquerque, NM ("**Manning's Storage**").  Based on surveillance

efforts, controlled buys, pole cameras, and GPS cellular phone location information, agents

---

[2] A "stash location" is a location commonly used by drug traffickers to store contraband. The purpose of a stash location is to store contraband away from the drug trafficker's primary residence in an effort to avoid law enforcement detection.

believe these two apartments and one storage unit are utilized as stash locations, where Garcia

and Manning store drugs for distribution.

6.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrants and does not set forth all of my knowledge about this matter.

7.      As a result of my personal participation in the investigation, statements made to

me by other law enforcement personnel involved in the investigation, reviews of reports of other

law enforcement personnel which I have read and deemed to be reliable, I believe there is

probable cause that the **SUBJECTS** have committed, are committing, and will continue to

commit offenses involving violations of *inter alia*:

      a.      21 U.S.C. § 841 – Distribution of controlled substances, including
          methamphetamine and fentanyl;

      b.      21 U.S.C. §  846 – Conspiracy to distribute controlled substances; and

      c.      21 U.S.C. § 856 – Maintaining a place for manufacture, distribution, or
          use of controlled substances.

## EVIDENCE SOUGHT DURING SEARCH

8.      Based on my training, experience, and participation in this and in similar

investigations, I believe that individuals involved in illegal trafficking of controlled substances

often conceal evidence of their drug trafficking activities in their residences and businesses, or

the residences of friends or relatives, and in surrounding areas to which they have ready access

such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including

vehicles outside of their residences and businesses, so that they have ready access to it and so

that they can hide it from law enforcement, including law enforcement officers executing search

warrants at their residences or businesses.  Evidence also may be found in other areas to which a

drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

9.     Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

10.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

11.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers

of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

12.     Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

13.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

14.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband,

money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

15.     Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

16.     Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

17.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious.  They also try to secret, transfer and conceal the money by (a) placing assets in names

7

other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

18.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

19.     The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-

conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

20.     Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

21.     Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

9

22.     I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

23.     Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

24.     Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video

10

surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

25.     Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

26.     A list of items agents seek authority to seize is in Attachment B.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the **SUBJECT PREMISES**, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

28.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often

requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the **SUBJECT PREMISES**.  However, taking the storage media off-

site and reviewing it in a controlled environment will allow its examination

with the proper tools and knowledge.

c.      Variety of forms of electronic media.  Records sought under this warrant

could be stored in a variety of storage media formats that may require off-site

reviewing with specialized forensic tools.

29.      *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

computers and/or storage media that reasonably appear to contain some or all of the evidence

described in the warrant, and would authorize a later review of the media or information

consistent with the warrant.  The later review may require techniques, including but not limited

to computer-assisted scans of the computer or entire medium, that might expose many parts of a

hard drive to human inspection in order to determine whether it is evidence described by the

warrant.

30.      The warrant I am applying for would permit law enforcement to obtain from

certain individuals the display of physical biometric characteristics (such as fingerprint,

thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure

pursuant to this warrant.  I seek this authority based on the following:

a.      I know from my training and experience, as well as from information

found in publicly available materials published by device manufacturers, that

many electronic devices, particularly newer mobile devices and laptops, offer

their users the ability to unlock the device through biometric features in lieu of

a numeric or alphanumeric passcode or password. These biometric features

include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more

14

convenient way to unlock a device than by entering a numeric or
alphanumeric passcode or password. Moreover, in some instances, biometric
features are considered to be a more secure way to protect a device's contents.
This is particularly true when the users of a device are engaged in criminal
activities and thus have a heightened concern about securing the contents of a
device.

e.      As discussed in this affidavit, based on my training and experience I
believe that one or more digital devices will be found during the search. The
passcode or password that would unlock the device(s) subject to search under
this warrant is not known to law enforcement. Thus, law enforcement
personnel may not otherwise be able to access the data contained within the
device(s), making the use of biometric features necessary to the execution of
the search authorized by this warrant.

f.      I also know from my training and experience, as well as from information
found in publicly available materials including those published by device
manufacturers, that biometric features will not unlock a device in some
circumstances even if such features are enabled. This can occur when a device
has been restarted, inactive, or has not been unlocked for a certain period of
time. For example, Apple devices cannot be unlocked using Touch ID when
(1) more than 48 hours has elapsed since the device was last unlocked or (2)
when the device has not been unlocked using a fingerprint for 4 hours *and* the
passcode or password has not been entered in the last 156 hours. Biometric
features from other brands carry similar restrictions. Thus, in the event law

15

enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.      In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

31.      Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of the

device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## INVESTIGATIVE TOOLS

32.     During the course of this investigation, investigators employed a number of investigative techniques including a confidential source ("CS"), physical surveillance, court authorized GPS cellular phone location information, and electronic surveillance utilizing pole cameras.

### *Confidential Source Qualification*

33.     Confidential Source 1 ("CS-1"), as discussed below, has assisted in this investigation and provided information set forth in this Affidavit. CS-1's information is based on his/her own independent personal knowledge, observations, and conversations with members of the GARCIA DTO.  CS-1 has provided trustworthy information that has been corroborated by DEA agents. This CS has never been found to be untruthful with agents and continues to provide reliable and accurate information. CS-1 is providing the government with information and assistance in exchange for remuneration and is not providing assistance in consideration of pending criminal charges. The CS does have an arrest that took place in June 2021 in relation to a speeding violation that occurred in Gallup, NM.

## **PROBABLE CAUSE**

### Inception of Investigation 2021

34.     In March 2021, DEA agents from the Albuquerque District Office ("ADO")

received information from CS-1 regarding Jeffrey Manning.[3] Per reliable CS-1 statements,

Manning distributes large quantities of cocaine and cocaine base ("crack") in the Albuquerque,

NM area. The CS further informed agents that Manning offered to sell CS-1 one ounce of

cocaine for $950. Additionally, CS-1 informed agents that Manning told CS-1 that he was being

sourced cocaine from an individual only known as "Leo"[4] at that time.

35.     Throughout the course of this investigation, agents have conducted five successful

controlled purchases of cocaine and crack cocaine from Manning. Over the past five months,

agents have compiled some of the suspected co-conspirators' names, phone numbers, addresses,

and vehicles, as well as the GARCIA DTO's possible sources of the illegal drugs, though the

expanse of the organization is still unknown to agents.

36.     Over the past several months, CS-1 controlled purchases, combined with

surveillance, court authorized GPS cellular phone location data, electronic surveillance through

pole cameras, and toll analysis, agents have identified Manning as a cocaine distributor for the

GARCIA DTO.

---

3 A review of Manning's criminal history indicated Manning has a lengthy criminal history from New Mexico, Texas, and California dating back to 1990, and is a convicted felon. Manning has multiple Federal convictions for wrongful use of cocaine and possession of a firearm during drug trafficking cocaine. Multiple convictions in NM, CA, and TX for trafficking controlled substances (distribution), transport/sell narcotics, and manufacturing controlled substances.
4 Agents believe "Leo" is an alias for Leonardo S. Garcia, who agents positively identified in late-May 2021. A review of Garcia's criminal history indicated Garcia has multiple arrests and convictions in NM for trafficking controlled substances (possess w/ intent).

**Manning's Residence**: 614 ½ Noble Place NE, Albuquerque, NM 87107

37.     Agents identified **Manning's Residence** in March 2021.  Utilizing court authorized GPS cellular phone location data, agents observed Manning's phone frequently pinging in the vicinity of **Manning's Residence** for long periods of time throughout the day and night. Additionally, through physical and electronic surveillance, agents confirmed and frequently observed Manning's vehicle parked at **Manning's Residence** on a regular basis**.** Agents further observed mail addressed to Manning at this residence after conducting a trash pull, as detailed below. Throughout the investigation, agents identified **Manning's Residence** as his primary residence. This investigation has also shown that Manning either leaves or returns to this residence after conducting drug deals, therefore, maintaining dominion and control of **Manning's Residence**.

### Controlled buy from Manning in March 2021

38.     In March 2021, agents met with CS-1 at a predetermined location for the purpose of conducting a controlled buy of cocaine from Manning in Albuquerque, NM.  There, agents searched CS-1 and his/her vehicle for contraband and none was located.  Agents provided CS-1 with a recording device and $950 of Official Advanced Funds ("OAF").  At approximately 11:09 a.m., under the direction of agents, CS-1 placed a recorded phone call to Manning on (505) 861-9841 ("Manning Phone 1").  Agents observed CS-1 dial the phone number.  Manning answered the phone call and they both agreed to meet at a public location in northeast Albuquerque, NM, for the purpose of conducting a one ounce cocaine deal. The phone call ended.

39.     At approximately 11:23 a.m., agents followed CS-1 from the predetermined location directly to the meet location that CS-1 and Manning agreed upon.

40.     At approximately 11:40 a.m., agents observed a white Chevrolet Malibu sedan bearing Texas ("TX") license plate MZT9799[5] driving in the parking lot of the meet location in northeast Albuquerque, NM.  Agents previously observed this vehicle driven by Manning on prior surveillances. Shortly thereafter, agents observed CS-1 enter into the passenger's side of the white Malibu sedan.

41.     At approximately 11:52 a.m. agents observed CS-1 exit the passenger's side of the white Chevrolet Malibu. Agents observed the white Malibu sedan depart from the parking lot and proceed northbound on San Mateo Boulevard.  At this time, agents positively identified Manning as the driver of the white Malibu sedan. Agents followed Manning to a shopping center parking lot just outside of Albuquerque, NM.

42.     Agents followed CS-1 back to the predetermined location and took custody of the one ounce of suspected cocaine. Agents, again, searched CS-1 and his/her vehicle and did not locate any contraband. Agents interviewed CS-1, who confirmed that the exchange was made with Manning, who was the sole occupant of the white Chevrolet Malibu. Agents then transported the one ounce of suspected cocaine to the ADO. There, agent's field tested a portion of the suspected cocaine, which tested presumptive positive for the presence of cocaine and weighed approximately 29.4 grams. The cocaine was subsequently sent to a DEA Laboratory for expert analysis and safekeeping.

---

5 According to TX Department of Motor Vehicles ("DMV"), plate MZT9799 is registered to Ean Holdings LLC at 1445 Gail Borden Place, El Paso, TX on a white 2020 Chevrolet sedan. Additionally, agents served an administrative subpoena to Enterprise Holding and discovered that Jeffrey Manning, DOB: ███/1969, was the current lessee on the white Chevrolet Malibu sedan bearing TX plate MZT9799.

<u>Canyon Vista Stash Location:</u> Canyon Vista Apartments, 3958 Montgomery Boulevard NE, Apt 86, Albuquerque, NM 87109

43.     Agents identified **Canyon Vista Stash Location** in March 2021. According to apartment rental records,[6] agents have learned that John Allison[7] ("Allison") currently rents **Canyon Vista Stash Location**. Per reliable CS-1 statements, Allison is believed to be a "runner"[8] and a "lookout"[9] for Manning. Through physical surveillance, and utilizing law enforcement databases, agents have learned that both Allison and Manning are associated with **Canyon Vista Stash Location**. Furthermore, agents obtained Enterprise Holding vehicle lease records[10] and learned that Manning lists **Canyon Vista Stash Location** as his primary residence. This investigation has also shown that Manning either leaves or returns to **Canyon Vista Stash Location,** after conducting drug deals, therefore, maintaining dominion and control of **Canyon Vista Stash Location.**

### Surveillance of Manning in April 2021

44.     On April 19, 2021, agents conducted surveillance on Manning for the purpose of identifying additional potential locations Manning might utilize.

45.     At approximately 11:35 a.m. agents received a GPS ping location for Manning Phone 1 in the vicinity of Montgomery Boulevard NE and San Mateo Boulevard NE. At

---

6 On April 6, 2021, agents served an administrative subpoena to the Villas Del Sol III (Canyon Vista) Apartments and obtained current apartment rental records. Agents learned that John Allison was the current lessee of apartment 86.

7 A review of Allison's criminal history indicated Allison has multiple arrests in NM and Georgia for trafficking controlled substances (distribution), multiple charges of criminal sexual penetration (personal injury), and aggravated battery (deadly weapon). Additionally, Allison has an active warrant out of NM for aggravated assault issued May 25, 2021.

8 Agents believe the term "runner" is street slang for a person who distributes smaller quantities of drugs for a higher-level drug dealer and brings back the total money collected, in return receiving a small percentage as payment for their services.

9 Agents believe the term "lookout" is street slang for a person who is instructed to keep a watchful eye for law enforcement or intruders while someone else is engaging in illicit activity.

approximately 11:45 a.m., agents located a white Chevrolet Malibu bearing TX license plate MZT9799[11] parked in the Montgomery Plaza Shopping Mall located at 5001 Montgomery Boulevard NE, Albuquerque, NM. Agents established surveillance in the parking lot of the shopping plaza.

46.    At approximately 11:53 a.m., agents observed Manning exit the Dollar Tree located within the Montgomery Plaza Shopping Mall and walk towards the white Malibu sedan. Agents observed Manning open the trunk of the white Malibu, close it, and walk toward the driver's side of the vehicle. Agents observed Manning enter the driver's seat of the white Malibu and close the door. At approximately 11:56 a.m., agents observed Manning depart from the area and travel westbound on Montgomery Boulevard NE.

47.    At approximately 12:02 p.m., agents observed Manning arrive at the Canyon Vista Apartments located at 3958 Montgomery Boulevard NE, Albuquerque, NM. Moments later, agents confirmed that Manning parked near building 5 and was no longer inside the vehicle. **Canyon Vista Stash Location** is located within building 5 of the Canyon Vista Apartments.

48.    At approximately 12:35 p.m., agents observed Manning walk from building 5 towards his vehicle, carrying a bag in his left hand. Agents observed Manning open the back passenger's side door and place the bag inside. Agents then observed Manning enter the driver's seat of the vehicle. Moments later, agents observed Manning depart from the parking lot and travel southbound in the apartment complex to a nearby dumpster where Manning discarded trash. Agents observed Manning continue to drive and exit the complex utilizing the

---

10 On June 17, 2021, agents served an administrative subpoena to Enterprise Holding for the vehicle rental records pertaining to Jeffrey Manning. According to Manning's rental profile with Enterprise, 3958 Montgomery Blvd, APT 86, Albuquerque, NM, is the address Manning listed as his primary residence.

west gate near the DK convenience store located at 3808 Montgomery Boulevard NE, Albuquerque, NM. After exiting the gate, agents observed Manning reverse into a parking space, facing west. At this time no one entered or exited Manning's vehicle.

49.     At approximately 12:42 p.m., agents observed a white Mercedes sedan arrive in the parking lot of the DK and park, facing east, next to Manning's vehicle. Agents observed the driver of the white Mercedes as an unidentified female ("UF-1") with dark pulled back hair. Agents observed UF-1 and Manning exchange something small through the driver's side window and then continue to talk. Minutes later, agents observed both vehicles depart from the parking lot and travel in separate directions. At this time, agents obtained the NM license plate for the white Mercedes sedan as AJJC50.[12]  At approximately 1:00 p.m., agents observed Manning's white Malibu sedan parked in the driveway at **Manning's Residence**. At approximately 2:26 p.m., surveillance was terminated at **Manning's Residence.**

50.     Based on my training, experience, conversations with other law enforcement investigators, and knowledge of the investigation, I believe the brief interaction between Manning and UF-1 and the exchange of an item through the car windows after departing from **Canyon Vista Stash Location** is indicative of a drug transaction that had just occurred. I further believe that Manning retrieved the drugs he distributed to UF-1 from **Canyon Vista Stash Location** prior to meeting with UF-1.

### Trash Pull at Manning's Residence in May 2021

51.     On May 5, 2021, agents conducted a trash pull at **Manning's Residence.** Agents examined the contents of the trash from **Manning's Residence** and located several items of

---

[11] This was the same vehicle agents observe Manning drive in March 2021.

evidentiary value. Agents observed numerous clear plastic baggies with one or both corners cut away. Based on my training, experience, and conversations with other law enforcement investigators, I believe this type of packaging is indicative of drug trafficking. Additionally, the packaging materials agents found in Manning's trash matched the packaging of the cocaine CS-1 purchased from Manning during the previous controlled buys. Agents also found one receipt for a cash deposit to a Navy Federal Credit Union checking account ending in 6644 on 04/24/2021, one piece of mail addressed to Jeffrey Manning at **Manning's Residence,** and numerous torn pieces of paper and multiple full page papers believed to be drug ledgers.

52.     The torn pieces of paper were reconstructed, and in total, eight whole pieces of paper were recovered, which are believed to be drug ledgers. These ledgers contain numbers that appear to be dollar amounts that Manning is expecting to collect from individuals that agents believe are working for Manning. These people are listed on the drug ledgers by either a name or alias, to include Allison's alias "ATL." Additionally, agents previously surveilled and identified several other individuals listed on the drug ledgers who met with Manning for a brief period of time. Agents believe these brief meetings were actions consistent with street-level drug distribution. Further, these ledgers make references to "soft," "hard," and "blues." Based on my training, experience, and conversations with other law enforcement investigators, I believe these terms refer to powder cocaine, crack cocaine, and fentanyl pills that are blue in color. Agents believe these ledgers detail the criminal network that operates below Manning.

---

12 According to NM DMV, plate AJJC50 is registered to Dionne ESPARZA (DOB: ████/1988) and Vincent ESPARZA (DOB: ████/1941) at 9136 Sabinal Drive NW, Albuquerque, NM 87114 on a 2016 white Mercedes 4-door sedan.

**Garcia's Residence:** 5309 Territorial Road NW, Albuquerque, NM 87120

53.     Agents identified Leonardo **Garcia's Residence** in June 2021. Through physical and electronic surveillance, agents have observed Garcia's vehicles parked in the driveway and front yard of **Garcia's Residence**. A trash pull was conducted at **Garcia's Residence,** which revealed mail addressed to Garcia at **Garcia's Residence**. PNM records further indicate the utility service at **Garcia's Residence** are actively established in Garcia's name. Throughout the investigation, agents have identified **Garcia's Residence** as Garcia's primary residence. This investigation has also shown that Garcia conducts drug deals in his driveway, therefore, maintaining dominion and control of **Garcia Residence.**

### Surveillance of Garcia in May 2021

54.     Agents first positively identified Garcia in late-May 2021 when CS-1 informed agents that Garcia was planning to arrive at a public location in NW Albuquerque in approximately one hour. CS-1 also informed agents that Garcia was driving a black BMW sedan with temporary tags.  Agents established surveillance and observed Garcia walking in the parking lot towards a black BMW sedan with temporary tags. Agents then observed Garcia enter the driver's seat of the black BMW sedan and depart from the parking lot. Approximately 25 minutes later, agents observed the black BMW sedan traveling westbound on Territorial Road NW. A few minutes later, agents conducted a spot check surveillance and observed that the black BMW sedan was parked in the front yard area of **Garcia's Residence**.

**Del Rio Stash Location:** Del Rio Apartments, 4601 Montano Road NW, Apt 107,
Albuquerque, NM 87120

55.     In early-June 2021, agents conducted a debrief with CS-1 regarding the drug

trafficking activities of Manning and Garcia. During this debrief, CS-1 stated that he/she has

heard that Garcia does not keep any drugs or bulk currency at his residence but instead

stores kilogram amounts of cocaine at an apartment near the northwest corner of Coors

Boulevard NW and Montano Road NW. Agents were able to identify and confirm **Del Rio Stash**

**Location** in early June 2021. According to the Del Rio Apartments rental records,[13] agents have

learned Derek Baca[14] ("Baca") is the current lessee for **Del Rio Stash Location**.  PNM records

further indicate the utility service at **Del Rio Stash Location** are actively established in Baca's

name. Through physical surveillance, agents have observed Baca entering and exiting apartment

107 utilizing keys to unlock and lock the front door. Also, Baca's black Nissan Titan truck

bearing NM license plate 599STK[15] consistently parks near **Del Rio Stash Location**, as well as a

black Acura sedan bearing NM license plate 281WPM.[16] Agents have observed Baca and Garcia

operating this Acura sedan on separate surveillances. Additionally, agents have observed Garcia

entering **Del Rio Stash Location** utilizing a key to unlock the front door and enter apartment 107

---

13 On June 8, 2021, agents served an administrative subpoena to the Del Rio Apartment complex regarding current
rental records. The subpoena showed apartment 107, located in building 17, was currently being leased to Derek
Baca.
14 A review of Baca's criminal record indicated Baca is wanted in Kansas for a failure to appear. Additionally, Baca
has drug related arrests in both NM and Utah.
15 According to NM DMV, plate 599STK is registered to Derek A. Baca, DOB: ▭/1982, at 4601 Montano Road
NW, Apartment 107, Albuquerque, NM, on a 2012 black Nissan Titan truck. Additionally, agents obtained a
License Plate Reader (LPR) query list that was run for NM plate 599STK and learned that this vehicle has hit a Las
Cruces, NM Interstate-25 checkpoint a total of eight times in 2021. Based on the frequent trips, agents believe this
Nissan Titan truck may be traveling south towards the border to pick up narcotics for the Garcia DTO.
16 According to NM DMV, plate 281WPM is registered to Angelica M. Gonzalez, DOB: ▭1981, at 9301
Volcano Road NW, 70, Albuquerque, NM, on a 2012 black Acura TL sedan. Agents have previously observed this
vehicle parked in front of **Garcia's Residence** for long periods of time. Additionally, agents believe Angelica
Gonzalez is a relative of Garcia.

on previous surveillances, therefore, also maintaining dominion and control over **Del Rio Stash Location.** Garcia's brief visits to **Del Rio Stash Location** are more detailed below.

**Surveillance of Manning and Garcia on June 2, 2021**

56.     On June 2, 2021, agents established surveillance at **Garcia's Residence**. A few minutes later, agents observed a black Nissan pickup truck bearing NM license plate 599STK arrive at **Garcia's Residence**. Agents observed the driver of the Nissan truck exit the driver's seat and walk towards the front door of **Garcia's Residence**. Agents observed Garcia answer the front door and allow the driver of the truck entry into the residence. Approximately 12 minutes later, agents observed the driver of the Nissan truck exit **Garcia's Residence,** enter the driver's seat of the Nissan truck, and depart from the residence.

57.     Approximately 30 minutes later, agents observed a black Ford sedan arrive at **Garcia's Residence**. Agents observed the driver of the Ford sedan exit and he was positively identified as Manning. Agents then observed Garcia exit his residence and walk to the trunk area of Manning's vehicle. Agents then observed Garcia hand Manning a multi-colored gift bag, which Manning then placed into the trunk of his vehicle. Agents then observed Garcia remove two plastic bags, one of which was clear, from Manning's vehicle trunk, each containing an item that weighed the bags down. One bag was clear and its contents resembled U.S. currency that was stacked horizontally inside of the bag. Agents then observed Manning enter his vehicle and depart from Garcia's residence. Surveillance units then followed Manning back to **Manning's Residence**.

58.     Agents then observed, via electronic surveillance, Manning open the trunk of his vehicle and remove an item from the trunk that resembled the bag that was just given to him by Garcia. Agents then observed Manning enter his residence. Surveillance on Manning was then

27

terminated. Later that day, agents observed a black Nissan Titan pickup truck parked near buildings 16 and 17 of the Del Rio Apartment complex where **Del Rio Stash Location** is located.[17] Agents confirmed that this vehicle was bearing NM plate 599STK, which is the same license plate displayed on the Nissan Titan pickup truck that was seen earlier in the day at **Garcia's Residence**. Surveillance was then terminated.

59.     Based on my training, experience, conversations with other law enforcement investigators, and knowledge of the investigation to date, I believe that the Baca traveled from **Del Rio Stash Location** and delivered drugs to Garcia, that were later distributed to Manning. In return, Manning provided Garcia with money as payment for the drugs. It is my belief that Manning then transported the drugs to his house, where he temporarily stored the drugs until they were later distributed and/or placed in other stash locations.

### Surveillance of Garcia on June 4, 2021

60.     On June 4, 2021, at approximately 2:00 p.m., agents established surveillance at **Del Rio Stash Location**. Agents observed Baca's black Nissan Titan truck bearing NM plate 599STK parked near buildings 16 and 17, under the carport, facing west.

61.     At approximately 3:55 p.m., agents observed a black Chevrolet Silverado truck bearing NM plate UNM38642[18] driving northbound in the parking lot of the apartment complex traveling towards building 17.  Agents observed the black Chevrolet truck park diagonally, facing south, on the north side of building 17. Agents then observed Garcia exit the driver's side

---

17 This apartment complex is northwest of the intersection of Coors Boulevard NW and Montano Road NW. This location is consistent with CS-1's statement that Garcia stores cocaine at an apartment near that intersection.
18 According to NM DMV, plate UNM38642 is registered to Angelica Gonzalez, DOB: ███/1981, at 9301 Volcano Road NW, 70, Albuquerque, NM on a 2014 black Chevrolet Silverado truck. Additionally, agents have previously observed this black Chevrolet Silverado truck parked in front of **Garcia's Residence** on previous surveillances.

of the truck and walk towards **Del Rio Stash Location**. Agents observed Garcia open the door to

**Del Rio Stash Location**, utilizing a key, and enter the apartment, disappearing out of view.

62.     At approximately 4:03 p.m., agents observed Garcia walking from the vicinity of

**Del Rio Stash Location** towards the black Chevrolet truck. Agents observed Garcia carrying a

blue and white rectangular-shaped cardboard box that was torn near the top where Garcia was

holding the box in his left hand. Garcia then entered the driver's seat of the black Chevrolet truck

and departed from the apartment complex. Due to Garcia maneuvering through traffic and

driving at a high rate of speed, agents were unable to maintain surveillance on Garcia.

Surveillance was subsequently terminated.

63.     Through surveillance, agents have not observed any behavior from Garcia

indicating that he resides at the **Del Rio Stash Location**, but the fact that Garcia had a key to the

apartment indicates to agents that Garcia maintains control of the apartment. Garcia's brief stay

at the apartment, where he retrieved a package, is consistent with the apartment being utilized as

a stash location where Garcia would obtain drugs that he intends to later distribute.

**Surveillance of Garcia on June 10, 2021**

64.     On June 10, 2021, at approximately 9:44 a.m., agents established surveillance at

**Del Rio Stash Location**. Agents observed Baca's black Nissan Titan truck bearing NM plate

599STK parked under the carport, facing west, near buildings 16 and 17.

65.     At approximately 12:22 p.m., agents observed a dark-colored BMW sedan

traveling northbound through the apartment complex and park underneath the carport directly in

front of building 17 in space number 1023. Agents did not observe a license plate on the vehicle

at this time, however, agents have previously observed Garcia operating a similar BMW sedan

with temporary tags in the rear window on May 31, 2021.  Moments later, agents observed

29

Garcia exit from the driver's seat, open the rear driver's side door of the BMW sedan, retrieve a black, laptop style, shoulder bag and place it on his left shoulder. Agents then observed Garcia walk towards the entryway of building 17 with the black bag on his left shoulder and keys in his right hand. Agents observed Garcia walk towards the vicinity of the front door to **Del Rio Stash Location** located on the right side of the hallway and enter the apartment, disappearing out of view. Approximately one minute later, agents observed Garcia walking from the vicinity of **Del Rio Stash Location** without the black bag, walking back towards the BMW sedan. Agents then observed Garcia enter the driver's seat of the vehicle and depart from the parking lot, proceeding southbound through the complex.  At approximately 1:00 p.m., surveillance was terminated at **Del Rio Stash Location.**

66.    Agents believe this brief visit at the **Del Rio Stash Location** is again consistent with the use of a stash location to store illegal narcotics. In this instance, instead of retrieving a package from the **Del Rio Stash Location**, it appeared that Garcia dropped off a package. Agents believe that this would be consistent with Garcia dropping off drugs and/or drug proceeds for safekeeping.

**Trash Pull Conducted at Garcia's Residence on June 18, 2021**

67.    On June 18, 2021, agents conducted a trash pull at **Garcia's Residence**. Upon retrieving the trash, agents inspected the contents from the trash bin and discovered the following items: multiple pieces of mail addressed to Leonardo Garcia at **Garcia's Residence**; plastic Ziploc style baggies that appeared to be twisted and torn near the bottom corners;[19] and two rectangular-shaped Caprisun cardboard juice boxes, which resembled the box Garcia was carrying from **Del Rio Stash Location** on June 4, 2021.

**Controlled Buy from Manning in July 2021**

68.      In early-July 2021, agents met with CS-1 for the purpose of conducting a controlled buy of crack cocaine from Manning. Agents outfitted CS-1 with a recording device and $500 of OAF to purchase approximately a half ounce of crack cocaine.

69.      At approximately 10:45 a.m., agents met with CS-1 at a predetermined location. There, agents searched CS-1 and his/her vehicle for contraband and none was located.

70.      At approximately 10:51 a.m., additional agents established surveillance on Manning who was located at **Canyon Vista Stash Location.** Agents observed Manning's black Ford Fusion sedan bearing NM license plate RFF655[20] parked in front of building 5 where **Canyon Vista Stash Location** is located. At approximately 10:54 a.m., agents observed Manning walking from building 5 towards the black Ford Fusion bearing NM plate RFF655 and enter the driver's seat. Shortly after, agents observed Manning depart from the parking lot of the apartment complex.

71.      At approximately 10:57 a.m., CS-1, under the direction of agents, placed a recorded phone call to Manning on Manning Phone 1.  Agents observed CS-1 dial the phone number. Manning answered the phone call and they both agreed to meet at a public location in northeast Albuquerque, NM, for the purpose of conducting a half ounce crack cocaine deal. The phone call ended.

72.      At approximately 11:00 a.m., agents observed Manning arrive at the Albertson's Market located at 4950 Montgomery Boulevard NE Albuquerque, NM 87109. Manning exited

---

19 Agents believe these plastic baggies resemble illegal narcotic packaging methods commonly used by drug traffickers

the driver's seat of the Ford Fusion and walked inside the store. At approximately 11:09 a.m., agents observed Manning exit the Albertson's Market, walk to the Ford Fusion, and enter the driver's seat. Moments later, Manning departed from the parking lot.

73.     At approximately 11:15 a.m., agents observed Manning arrive at the $1.50 Laundromat located in a strip mall at the northeast corner of Carlisle Boulevard NE and Hilton Avenue NE in Albuquerque, NM. Agents observed Manning walk to the trunk of his Ford Fusion, open it, remove an item, and walk into the business. While the trunk lid was open, agents observed a white laundry basket in the trunk. When Manning returned at approximately 11:19 a.m., he was carrying a small box in his right hand, similar to that of a small box containing dryer sheets. At approximately 11:20 a.m., agents observed Manning enter the driver's seat of the Ford Fusion and depart from the shopping center, traveling southbound on Carlisle.

74.     During this time, agents followed CS-1 from the predetermined location directly to the meet location that CS-1 and Manning agreed upon. At approximately 11:31 a.m., agents observed Manning arrive to the meet location, park his vehicle near CS-1's vehicle, and remain stationary. Moments later, agents observed CS-1 enter the front passenger's seat of Manning's Ford Fusion.

75.     At approximately 11:38 a.m., agents observed CS-1 exit the passenger's seat of Manning's vehicle and return to his/her vehicle. Agents then followed CS-1 to the predetermined location and took custody of the half ounce of crack cocaine from CS-1. Agents, again, searched CS-1 and his/her vehicle and did not locate any contraband.

---

20 According to NM DMV, plate RFF655 is registered to Ean Holdings LLC on a 2020 black Ford Fusion sedan. Agents have observed Manning operate this vehicle on previous surveillances. Additionally, agents served an administrative subpoena to Enterprise Holdings on June 16, 2021, and discovered that Jeffrey Manning, DOB: ████1969, is the current lessee on the black Ford Fusion sedan bearing NM plate RFF655.

76.     Agents debriefed CS-1 regarding the conversation, which was recorded, CS-1 had with Manning during the deal. CS-1 stated that while s/he was in Manning's black Ford Fusion, CS-1 handed Manning $500 of OAF in exchange for a half ounce of crack cocaine. CS-1 also stated that Manning told him/her that he picks up approximately four to five "bricks"[21] a month from "Leo" and spends $150,000 to $200,000 at a time. Additionally, Manning informed CS-1 that he (Manning) does not keep any cocaine at his residence and that he immediately takes the cocaine to a storage facility and/or various girlfriend's houses after picking it up. Additionally, Manning informed CS-1 that he (Manning) was meeting with Garcia later that day or early the next day before Garcia went out of town. Agents reviewed the recorded conversation between CS-1 and Manning during the deal and confirmed CS-1's statements.

77.     Agents transported the half ounce of crack cocaine to the DEA ADO and field tested a portion of the crack cocaine, which tested presumptive positive for the presence of cocaine. The cocaine's gross weight was 14.7 grams. The cocaine was subsequently sent to the South Central Laboratory for expert analysis and safekeeping.

78.     After CS-1 departed from the meet location, agents maintained surveillance on Manning. At approximately 11:54 a.m., agents observed Manning arrive to 6919 Ivy Place NW, Albuquerque, NM, which is a known residence for Bobby Singletary. Minutes after Manning arrived, agents observed a male, who agents believe was Singletary, exit the residence and enter the front passenger's seat of Manning's vehicle. At approximately 12:01 p.m., agents observed Singletary exit Manning's vehicle and return to the residence. One minute later, agents observed Singletary return to Manning's vehicle. At approximately 12:05 p.m., agents observed Singletary exit Manning's vehicle again and return to the residence. Subsequently, Manning

21 Agents believe the term "bricks" is street slang for a large quantity of drugs packaged in a brick shape,

33

departed from Singletary's residence and at approximately 12:44 p.m., surveillance was terminated.

79.     Based on my training, experience, conversations with other law enforcement investigators, and knowledge of the investigation, I believe Manning's brief interaction with Singletary outside of Singletary's residence were actions consistent with street-level drug distribution. Additionally, agents have observed Manning meet with Singletary at his residence for short periods of time on multiple occasions and have also observed the name "Bobby" on the suspected drug ledgers agents acquired from Manning's trash, as mentioned above.

**Manning's Storage:** RightSpace Storage, 4620 Pan American East Freeway NE, Unit C29, Albuquerque, NM 87109

80.     As mentioned above, in early-July 2021, agents heard, via recording device, Manning inform CS-1 during a controlled buy that he utilizes a storage unit to store illegal narcotics and does not keep contraband at **Manning's Residence**. On July 8, 2021, as more detailed below, agents observed Manning travel to the RightSpace Storage facility located at 4620 Pan American East Freeway NE**,** Albuquerque, NM. On July 12, 2021, agents served an administrative subpoena to RightSpace Storage and discovered that Manning is currently renting storage unit C29 at this location. Storage unit C29 is a 5X5 storage unit at $59.00/month rental rate. Additionally, the facility is accessed through a security keypad that requires a key code. Based on these keypad entries, the facility can generate a list of which storage unit renter enters and exits the facility and at what time. According to additional information obtained from the storage facility, via subpoena, Manning entered his pin code to gain access to the facility a total of eight times throughout the month of July and a total of four times between August 3, 2021, and August 5, 2021. Records obtained from RightSpace Storage show that Manning is still the

---

specifically referring to cocaine.                                          34

listed lessee of Manning's Storage. The information obtained also showed Manning exited the
facility between approximately two to six minutes after each entry and also frequented the
storage facility multiple times per day on some occasions. Based on my training, experience,
conversations with other law enforcement investigators, and knowledge of the investigation, I
believe the frequent and short durations of time Manning enters and exits the storage facility is
consistent with drug traffickers storing contraband away from the drug trafficker's primary
residence in an effort to avoid law enforcement detection.

### Surveillance of Garcia and Manning on July 8, 2021

81.     On July 8, 2021, at approximately 11:18 a.m., agents received a 401-meter GPS
ping location for Manning Phone 1 in the vicinity of Old Coors Drive SW and Gonzales Road
SW. Minutes later, agents observed a black Ford Fusion sedan bearing NM license plate RFF655
traveling westbound on Gonzales Road SW and then proceed southbound on Bataan Drive SW.
Agents then observed the black Ford Fusion turn westbound onto Ivy Place SW,[22] out of view.
Minutes later, the black Ford Fusion was observed traveling northbound on Bataan Drive SW
from the vicinity of Ivy Place SW. At this time, agents confirmed Manning as the driver and sole
occupant of the black Ford Fusion bearing NM license plate RFF655. Agents maintained
surveillance on Manning as he proceeded northbound on Coors Boulevard SW.

82.     At approximately 11:36 a.m., agents observed Manning turn westbound onto
Montano Road NW from Coors Boulevard NW. At this time, agents were unable to maintain
surveillance on Manning. However, during this time, agents were monitoring, via electronic
surveillance, **Garcia's Residence** which is in the vicinity of Montano Road NW and Coors

---

22 Based on the location Manning was observed, agents believe Manning traveled to 6919 Ivy Place SW,
Albuquerque, NM, which is a residence associated with Bobby Singletary, a suspected criminal associate of
Manning's.

Boulevard NW. At approximately 11:43 a.m., agents observed a black BMW sedan arrive at **Garcia's Residence** and park in the gravel area in front of the residence. Moments later, agents observed the garage door open, Garcia exit the driver's seat of the black BMW sedan, and enter the garage, disappearing out of view. Agents observed the garage remain open.

83.     At approximately 11:45 a.m., agents observed Manning arrive at **Garcia's Residence** and park curbside, facing west, directly in front of the driveway. At approximately 11:46 a.m., agents observed Garcia walk from the garage towards the black BMW sedan and open the rear driver's side door. Agents then observed Garcia retrieve a black laptop style bag from the backseat, close the rear driver's side door, and walk towards Manning's vehicle, holding the black laptop style bag in his left hand. At this time, agents observed Garcia place the black laptop style bag on the passenger's seat of Manning's vehicle, utilizing the open passenger's side window. Agents observed Garcia leaning on the passenger's side window sill of Manning's vehicle, appearing to be engaged in a conversation with Manning, who was still sitting inside of his vehicle. At approximately 11:47 a.m., agents observed Garcia retrieve an item from inside Manning's vehicle and then walk back towards the garage, carrying a rectangular-shaped item in his left hand. Agents observed Garcia enter the garage, disappearing out of view, and Manning depart from **Garcia's Residence**, traveling westbound on Territorial Road NW. Agents maintained surveillance on Manning.

84.     Based on my training, experience, conversations with other law enforcement investigators, and knowledge of the investigation, I believe Manning picked up illegal narcotics from Garcia at **Garcia's Residence**. Additionally, the black laptop style bag that Garcia retrieved from the backseat of the BMW closely resembled the black laptop style bag agents observed Garcia carrying into **Del Rio Stash Location** on June 4, 2021. Also, as mentioned

above, agents heard, via recording device, Manning inform CS-1 during the controlled buy of

crack cocaine the day prior, that he (Manning) would be meeting with Garcia later that day of the

controlled buy or early the next day before Garcia went out of town.

85.    At  approximately 12:02 p.m., agents observed, via electronic surveillance,

Manning arrive at **Manning's Residence** without making any stops from **Garcia's Residence**.

Agents observed Manning park underneath the carport located on the west side of the residence,

becoming out of view.

86.    At approximately 12:29 p.m., agents observed a black hatchback vehicle arrive to

**Manning's Residence** and park in the driveway. Moments later, agents observed a slender

unidentified male ("UM-1"), wearing a white tank-top shirt, exit the driver's side of the black

hatchback vehicle and walk inside **Manning's Residence** utilizing the front door. At

approximately 12:43 p.m., agents observed UM-1 exit the front door of **Manning's Residence**,

enter the driver's seat of the black hatchback, and depart from the residence. Agents established

surveillance on UM-1 and obtained the license plate as Tennessee ("TN") 2X02E3,[23] while other

agents maintained surveillance on **Manning's Residence.**

87.    At approximately 12:59 p.m., agents followed the black hatchback to the

intersection of 4th Street NW and Rosemont Ave NW and observed the black hatchback park on

the south side of Rosemont Ave NW facing 4th Street NW. Agents observed that the driver of

the black hatchback was still sitting in the driver's seat. At approximately 1:15 p.m., agents

observed an unidentified black female ("UF-2") enter the front passenger seat of the black

hatchback. Moments later, the black hatchback traveled southbound on 4th Street NW, with UF-

2 still in the vehicle. At approximately 1:23 p.m., agents observed the black hatchback parked in a parking lot located at 1810 Lomas Boulevard NE, Albuquerque, NM. Agents observed that the black hatchback was facing west and was parked immediately next to a red Dodge Durango that was parked facing east and was occupied by at least two unidentified black males, one of which was UM-1. Approximately 5 minutes later, agents observed UM-1 exit the passenger's seat of the red Dodge Durango and enter the driver's seat of the black hatchback. Moments later, agents observed the red Dodge Durango exit the parking lot followed by the black hatchback. Surveillance was then terminated on the black hatchback. At this time, agents obtained the red Dodge Durango NM license plate as NMK429.[24]

88.     Based on the pattern of events that transpired during the surveillance thus far, agents believe Manning picked up an unknown amount of drugs from Garcia at **Garcia's Residence** and then transported the drugs back to **Manning's Residence,** where Manning then distributed an unknown amount of drugs to UM-1. Based on the brief interaction UM-1 had with the driver of the red Dodge Durango, agents believe UM-1 then distributed drugs to the driver in the red Dodge Durango. Additionally, agents believe all the actions observed are consistent with street-level drug trafficking.

89.     At approximately 12:50 p.m., agents observed a white SUV arrive to **Manning's Residence** and park near the driveway, facing west. Agents observed an unidentified black male ("UM-2"), wearing a red t-shirt, exit the driver's seat of the white SUV and walk towards the front door of **Manning's Residence**, entering and becoming out of view. At approximately 12:52

---

23 According to TN DMV, plate 2X02E3 is registered to Ean Holdings LLC at 2306 Alcoa Highway Alcoa, TN 37701 on a black Chevrolet Spark hatchback.  Agents obtained Enterprise rental records for TN plate 2X02E3 and discovered that Kimberly Romero, DOB: ████/1988, with an address of 1700 Market Street NW, Apartment 1207, Albuquerque, NM, is currently on the rental agreement for this vehicle as of July 6, 2021.

p.m., agents observed UM-2 exit the front door of **Manning's Residence**, enter the driver's seat of the white SUV, and depart from the residence. Shortly after, agents observed the white SUV travel southbound on Edith Boulevard NE and obtained the license plate as NYN266.[25] After obtaining the license plate, agents terminated surveillance on the white SUV and re-established surveillance back on **Manning's Residence.**

90.     At approximately 1:16 p.m., agents observed the same white SUV arrive back to **Manning's Residence** and park near the driveway, facing west. At this time, UM-2 exited the driver's seat and another male exited the passenger's seat of the white SUV. Based on the clothing description, agents later determined the male who exited the passenger's seat of the white SUV was John Allison. Both UM-2 and Allison walked towards the front door of **Manning's Residence** and entered. At approximately 1:20 p.m., agents observed UM-2 and Allison exit the front door of **Manning's Residence**, walk towards the white SUV, and enter the vehicle. Moments later, UM-2 and Allison departed from the residence. At this time, agents maintained surveillance on the white SUV. At approximately 1:30 p.m., agents observed the white SUV enter the gate to the Canyon Vista Apartments where **Canyon Vista Stash Location** is located. Agents observed the white SUV parked, facing east, in front of building 5. Minutes later, agents observed the white SUV  departing from the vicinity of **Canyon Vista Stash Location** and exit the apartment complex utilizing the main gate entrance located on Montgomery Boulevard NE. Agents were unable to maintain surveillance on the white SUV but re-established surveillance on **Manning's Residence**.

---

24 According to NM DMV, plate NMK429 is registered to Hector ESTRADA-Alarcon, DOB: ▆▆▆/1964, at 1901 Arno Street SE, Albuquerque, NM on a 2004 red Dodge Durango SUV.
25 According to NM DMV, plate NYN266 is registered to Robin Curtis (DOB: 04/15/1955) at 6901 Glenrio Road NW, Albuquerque, NM 87121 on a 2003 white Ford SUV.

91.     At approximately 1:38 p.m., agents observed the same white SUV arrive at **Manning's Residence** and park near the driveway, facing west. Agents observed UM-2 exit the driver's side of the white SUV and walk towards the front door of **Manning's Residence**, entering and becoming out of view. At approximately 3:20 p.m., agents observed UM-2 and Manning exit the front door of the residence. Agents observed UM-2 walk towards the white SUV and Manning walk towards the carport where his vehicle was parked. Moments later, UM-2 departed in the white SUV and Manning departed in the black Ford Fusion. At this time, agents maintained surveillance on Manning.

92.     At approximately 3:30 p.m., agents observed Manning enter the parking lot of RightSpace Storage facility located at 4620 Pan American Freeway NE, Albuquerque, NM ("**Manning's Storage**"). Agents observed Manning parked at the dial pad near the gate entrance located on the west side of the property. Moments later, agents observed Manning's vehicle proceed through the open gate and travel to storage units located on the east side of the property. At approximately 3:36 p.m., agents observed Manning's vehicle exit the same gate that he initially used to enter the property and proceed southbound on Pan American Freeway NE.

93.     At approximately 3:39 p.m., agents observed Manning arrive at the Canyon Vista Apartments and park in front of building 5 where the **Canyon Vista Stash Location** is located. Agents also observed the white SUV, bearing NM license plate NYN266, parked in front of building 5. Moments later, agents observed the white SUV depart from the parking lot area. Agents observed Manning's vehicle with its brake lights on and Allison talking to Manning at the driver's side window. Agents observed an unidentified male ("UM-3") enter Manning's front passenger seat. Agents then observed UM-3 go back and forth from Manning's vehicle to the **Canyon Vista Stash Location** several times. At approximately 3:51 p.m., agents observed a

gray Dodge Charger arrive and park next to Manning's vehicle on the passenger side. Moments

later, the driver of the gray Dodge Charger, a Hispanic female who agents later positively

identified as Amira Garcia ("A. Garcia"), exited from the driver's seat and entered the right rear

passenger side of Manning's vehicle. Agents also observed that A. Garcia was carrying a large

tote bag on her shoulder. Minutes later, agents observed A. Garcia exit Manning's vehicle, sling

the tote bag over her shoulder, and enter the driver's seat of the gray Dodge Charger. Agents

then observed the gray Dodge Charger immediately depart from the parking lot followed by

Manning. Agents observed both vehicles travel towards the exit gate on Montgomery Boulevard

NE and the gray Dodge Charger travel westbound on Montgomery Boulevard NE. At this time,

agents obtained the NM license plate on the gray Dodge Charger as UNM40006.[26]  Agents also

observed Manning travel eastbound on Montgomery Boulevard NE and make a southbound turn

onto Morningside Drive NE. Surveillance on Manning was then terminated.

94.    At approximately 3:58 p.m., agents observed the gray Dodge Charger arrive at

Quickshine Express Car Wash located at 3525 Montgomery Boulevard NE, Albuquerque, NM,

and park, facing east, at a vacuum stall. Moments later, agents observed an unidentified male

("UM-4") exit the passenger's side of the gray Dodge Charger and walk towards a red sedan also

parked in a vacuum stall, to the south of the gray Dodge Charger. At approximately 4:05 p.m.,

agents observed the gray Dodge Charger depart from the carwash parking lot. Agents observed

UM-4 briefly meet with the driver of the red sedan and then walk towards a gray Buick

sedan that was initially parked next to the gray Dodge Charger. At this time, agents obtained the

---

26 According to NM DMV, plate UNM40006 is registered to Amira D. Garcia, DOB: ▮▮▮▮/1999, at 3100 Jane
Place NE, R103, Albuquerque, NM 87111 on a 2019 gray Dodge Charger. After reviewing a NM driver's license
photo of A. Garcia, agents positively identified the driver of the gray Dodge Charger as A. Garcia. Additionally,
based on toll analysis agents conducted on Leonardo Garcia's phone, agents discovered that A. Garcia is a high
volume contact of Leonardo Garcia.

NM license plate as AJZK91.[27] Agents then observed UM-4 enter the driver's seat of the gray Buick sedan and depart from the car wash parking lot. At approximately 4:07 p.m., surveillance was terminated.

95.     Based on my training, experience, conversations with other law enforcement investigators, and knowledge of the investigation, I believe Manning traveled to **Manning's Storage** to store an unknown quantity of drugs and/or drug proceeds that he acquired from Garcia and/or other individuals earlier that day. Additionally, I believe Manning traveled to the **Canyon Vista Stash Location** after stopping at **Manning's Storage** in order to distribute drugs and/or retrieve drug proceeds from the individuals Manning briefly interacted with in front of the **Canyon Vista Stash Location.** Furthermore, I believe Manning either supplied A. Garcia with drugs and/or provided A. Garcia with drug proceeds that she (A. Garcia) may have been collecting on behalf of Garcia. Additionally**,** I believe A. Garcia's brief meeting with UM-4 at the Quickshine Express Car Wash after meeting with Manning at the **Canyon Vista Stash Location** are actions consistent with street-level drug trafficking. Also, I believe UM-4's brief interaction with the driver of the red sedan after meeting with A. Garcia appeared to be indicative of a drug transaction that had just occurred.

### Surveillance of Garcia on July 19, 2021

96.     On July 19, 2021, agents observed, via electronic surveillance, a black Ford Fusion sedan arrive to **Garcia's Residence.** Agents observed the black Ford sedan[28] pull up towards the curb area in front of **Garcia's Residence,** near the driveway. At this time, agents could not maintain surveillance on the black Ford sedan because it was out of view. Moments

---

27 According to NM DMV, plate AJZK91 is registered to Loretta Rodriguez (DOB: ████/1979) at 6200 Mossman Place NE, Albuquerque, NM, on a gray 2015 Buick sedan.

later, agents observed Garcia walking from the vicinity of the front door of his residence towards the black Ford sedan, carrying a white and yellow rectangular-shaped box in his left hand. A few minutes later, agents observed Garcia walking away from the vicinity of the black Ford sedan, now carrying a brown bag in his left hand. Agents then observed Garcia walk towards the vicinity of the front door to his residence, disappearing out of view.

97.     Although agents were unable to observe who Garcia met with, and how/if items were exchanged, the fact that Garcia was observed walking out with a yellow box, and returning with a brown bag, suggests that he exchanged items with someone. Agents believe that a short meeting outside someone's residence where the parties exchange items would be consistent with a drug transaction where the person in the house supplies a quantity of drugs and receives payment in return.

**Surveillance of Derek Baca at Del Rio Stash Location on July 22, 2021**

98.     On July 22, 2021, a DEA Task Force Officer (TFO) established surveillance at the Del Rio Apartments where **Del Rio Stash Location** is located. At approximately 1:27 p.m., the TFO observed a male wearing a black ball cap, black t-shirt, black shorts, and black rimmed glasses walking from the north side of building 17 towards the breezeway located in the center of the building. The TFO observed the male carrying a large black duffel bag on his back. At this time, the TFO positively identified the male as Baca after viewing a NM driver's license photo of Baca. Agents observed Baca open the door to apartment 107 and enter, becoming out of view.

99.     The TFO then observed Baca exit from apartment 107, close the door, and lock it with keys. Baca was no longer carrying the black duffel bag. The TFO then observed Baca walk

---

28 The black Ford Fusion sedan very closely resembled the same vehicle agents have observed MANNING drive

out of the breezeway towards a black Nissan Titan pickup truck[29] that was parked, facing west, under the carport located to the south of building 17. Moments later, the TFO observed Baca enter the driver's seat of the black Nissan pickup truck and then immediately exit the driver's seat and close the door. At this time, the TFO observed Baca looking down at his cellular phone while walking away from the black Nissan pickup truck towards the north side of building 17, disappearing out of view. Minutes later, the TFO observed a black Acura sedan depart from the parking lot area located on the north side of building 17. The TFO observed that the black Acura sedan had its windows down and Baca was the driver. The TFO observed the license plate of the Acura sedan as NM plate 281WPM. This is the same Acura sedan that agents have observed both Baca and Garcia driving.

100.    Agents believe that Baca driving a car that has been observed being driven by Garcia and is registered to the relative of Garcia further demonstrates that there is a connection between Garcia and Baca. Furthermore, agents believe that Garcia is providing Baca with a vehicle to conduct drug trafficking activities for the GARCIA DTO.

**Surveillance at Garcia's Residence on July 29, 2021**

101.    On July 29, 2021, at approximately 11:51 a.m., agents observed, via electronic surveillance, a black Ford Fusion sedan arrive to **Garcia's Residence** followed in tandem by a black BMW sedan. The black BMW sedan is a vehicle agents have observed being driven by Garcia, which parked in the gravel area directly in front of **Garcia's Residence**. Additionally, the black Ford Fusion sedan closely resembled the same vehicle agents have also previously observed Manning drive during controlled buys and surveillances. Agents observed the black

---

during controlled buys and previous surveillances at GARCIA's residence.
29 On June 2, 2021, agents observed this black Nissan Titan truck bearing NM plate 599STK arrive to **Garcia's Residence**. Agents also know this vehicle is registered to Derek Baca.

Ford Fusion sedan park curbside, facing west, directly in front of the driveway of **Garcia's Residence**.

102.    At approximately 11:52 a.m., agents observed Garcia exit the driver's seat of the black BMW sedan carrying a black bag on his left shoulder and a white plastic bag in his left hand. Agents observed Garcia proceed to walk towards the front door of his residence, disappearing out of view. Agents observed the black Ford Fusion remain stationary in front of **Garcia's Residence** and no one exit or enter the vehicle. It also appeared to agents that the black Ford sedan had only one occupant.[30] At approximately 12:00 p.m., agents observed the garage door of **Garcia's Residence** open and Garcia walk out of the garage carrying a white bag in his left hand. Agents observed Garcia walk towards the passenger's side of the black Ford sedan and place the white bag on the passenger's seat utilizing the open passenger's side window. Agents then observed Garcia immediately retrieve a white rectangular-shaped box from the passenger's seat and hold it in his left hand. Agents then observed Garcia and the driver of the black Ford Fusion appear to be engaging in a conversation through the passenger's side window. At approximately 12:01 p.m., agents observed Garcia, carrying the white rectangular-shaped box in his left hand, walk towards the open garage and enter, disappearing out of view. Simultaneously, the black Ford Fusion departed from **Garcia's Residence.**

103.    Based on my training, experience, conversations with other law enforcement investigators, and knowledge of the investigation, I believe the brief interactions between Garcia and the driver of the Ford Fusion outside of **Garcia's Residence**, as well as, the exchange of items are actions consistent with drug trafficking.

**Spot Check Surveillance at the Canyon Vista Stash Location on August 5, 2021**

104.    On August 5, 2021, an agent conducted a spot check surveillance at the **Canyon Vista Stash Location** and observed Manning's black Ford Fusion sedan bearing NM plate RFF655 parked in front of building 5 where **Canyon Vista Stash Location** is located. At this time, an agent observed and positively identified Manning as the driver and sole occupant sitting inside the vehicle. Moments later, an agent observed Allison exit apartment 86, descend down the stairwell of building 5, walk towards Manning's vehicle, and enter the front passenger's seat. Manning's vehicle remained stationary and it appeared to the agent that Manning and Allison were conversing inside the vehicle. Surveillance was subsequently terminated.

105.    Based on the knowledge of the investigation, it is my belief that Manning continues to frequent the **Canyon Vista Stash Location** and also utilizes the location to store illegal narcotics. Additionally, I believe Allison continues to work for Manning as a stash house operator who provides security for the **Canyon Vista Stash Location**.

**Surveillance at Garcia's Residence on August 11, 2021**

106.    On August 11, 2021, at approximately 6:09 p.m., agents observed, via electronic surveillance, Garcia arrive to **Garcia's Residence** in his black BMW sedan and park in the driveway in front of the garage. Agents observed Garcia exit the driver's seat, carrying an item in his left hand, and enter the residence through the garage, disappearing out of view. Approximately 20 minutes later, agents observed a silver Lexus sedan bearing NM license plate 24386UNM[31] arrive to **Garcia's Residence** and park in the driveway. Agents observed a male,

---

30 Based on past surveillances, specifically June 2, 2021 and July 19, 2021, agents believed MANNING was the driver of the black Ford Fusion.

31 According to NM DMV, plate 24386UNM is registered to Sergio R. Tena, DOB: ███ 1975, at 7200 Sol Poniente NW, Albuquerque, NM on a 2007 silver Lexus sedan. Additionally, after viewing a NM driver's license photo of Sergio R. Tena, agents believe the driver of the Lexus was Tena.

wearing a black t-shirt and yellow shorts, exit the driver's seat of the Lexus and walk towards the

vicinity of the front door of **Garcia's Residence,** disappearing out of view. Minutes later, agents

observed the male walk from the vicinity of the front door carrying a white item in his right

hand. Agents then observed the male enter the driver's seat of the Lexus and depart from

**Garcia's Residence.**

107.    At approximately 7:07 p.m., agents observed a black Audi sedan arrive to

**Garcia's Residence** and park in the driveway. At this time, agents observed the garage door of

**Garcia's Residence** open and a male wearing a black tank-top, black shorts, and a black ball cap

exit the driver's seat of the Audi and walk towards the open garage. Agents observed the male

and Garcia in the garage and then immediately exit from the garage, both walking towards the

rear of Garcia's BMW. Agents then observed Garcia open the trunk of his BMW and retrieve a

large brown bag that contained what appeared to be a white item. Agents observed Garcia hand

the bag to the male, who then placed the bag in the backseat of the Audi. Agents then observed

Garcia close the trunk of the BMW and both Garcia and the male departed from each other.

Subsequently, Garcia entered the garage of his residence and the male entered the driver's seat of

the Audi and departed from the residence. At approximately 7:09 p.m., agents established

surveillance on the Audi and obtained the NM license plate as AYWD92.[32] Agents followed the

Audi sedan to a residence located at 2841 Palo Verde Drive NE, Albuquerque, NM without

making any stops after departing from **Garcia's Residence.** Surveillance was subsequently

terminated on the Audi and re-established at **Garcia's Residence**.

---

32 According to NM DMV, plate AYWD92 is registered to Donavan Jones Neha, DOB: ███/1981, at 2841 Palo
Verde Drive NE, Albuquerque, NM on a 2015 black Audi 4D sedan. Additionally, after viewing a NM driver's
license photo of Donavan J. Neha, agents believe the driver of the Audi was Neha.

108.     At approximately 7:48 p.m., agents observed a white sedan arrive to **Garcia's Residence** and park in the driveway. Moments later, agents observed a female exit the driver's seat of the white sedan, carrying a purse, and walk towards Garcia, who was standing outside of the residence. Agents observed the female and Garcia walk towards the front door, disappearing out of view. At this time, agents obtained the NM license plate of the white sedan as 751WSL.[33] At approximately 8:07 p.m., agents observed the female walk from the vicinity of the front door, carrying a purse, enter the driver's seat of the white sedan, and depart from **Garcia's Residence**.

109.     Based on my training, experience, conversations with other law enforcement investigators, and knowledge of the investigation, I believe Garcia conducted several drug transactions at **Garcia's Residence**. Based on the brief interactions with the individuals who arrived to **Garcia's Residence** and departed minutes later, as well as, the exchange of a bag between Garcia and the male driving the black Audi, I believe these are all actions consistent with drug trafficking.

**Controlled Buy from Manning in August 2021**

110.     In mid-August 2021, agents met with CS-1 at a predetermined location for the purpose of conducting a controlled buy of crack cocaine from Manning in Albuquerque, NM. There, agents searched CS-1 and his/her vehicle for contraband and none was located.  Agents provided CS-1 with a recording device and $900 of OAF. At approximately 11:10 a.m., under the direction of agents, CS-1 placed a recorded phone call to Manning on Manning Phone 1. Agents observed CS-1 dial the phone number.  Manning answered the phone call and they both

---

33 According to NM DMV, plate 751WSL is registered to Daniela Leticia Castanon, DOB: ████/1993, at 6319 Bluewater Road NW, Albuquerque, NM on a 2020 white Volkswagen 4D sedan. Additionally, after viewing a NM driver's license photo of Daniela Castanon, agents believe the driver of the white Volkswagen was Castanon.

agreed to meet at a public location in northeast Albuquerque, NM, for the purpose of conducting a one-ounce crack cocaine deal. The phone call ended.

111.    At approximately 11:30 a.m., agents followed CS-1 from the predetermined location directly to the meet location that CS-1 and Manning agreed upon.

112.    At approximately 11:45 a.m., agents observed a dark gray Ford Fusion sedan bearing Nevada ("NV") license plate 609K52[34] arrive to the meet location and park to the east of CS-1's vehicle. Shortly thereafter, agents observed CS-1 enter into the passenger's side of the gray Ford Fusion. At this time, agents positively identified Manning as the driver and sole occupant of the gray Ford Fusion.

113.    At approximately 11:50 a.m., agents observed CS-1 exit the passenger's side of Manning's vehicle. Agents observed Manning depart from the parking lot and proceed westbound on Montgomery Boulevard NE. An agent followed Manning to the vicinity of **Manning's Residence.** Minutes later, at approximately 12:00 p.m., agents observed, via electronic surveillance, Manning arrive to **Manning's Residence** and park underneath the carport located on the west side of the residence, becoming out of view. At this time, surveillance was terminated on Manning.

114.    Agents followed CS-1 back to the predetermined location and took custody of the one ounce of suspected crack cocaine. Agents, again, searched CS-1 and his/her vehicle and did not locate any contraband. Agents interviewed CS-1, who confirmed that the exchange was made with Manning, who was the sole occupant of the gray Ford Fusion. Agents then transported the one ounce of suspected crack cocaine to the ADO. There, agent's field tested a portion of the

suspected crack cocaine, which tested presumptive positive for the presence of cocaine and weighed approximately 29.0 grams. The cocaine was subsequently sent to a DEA Laboratory for expert analysis and safekeeping.

115.    Based on my training, experience, conversations with other law enforcement investigators, and knowledge of the investigation, I believe Manning distributes and will continue to distribute illegal narcotics in the Albuquerque, NM area. This investigation has also continually shown that Manning leaves or returns to **Manning's Residence** after conducting drug deals, therefore, continuing to maintain dominion and control of **Manning's Residence.**

### Surveillance of Garcia at Del Rio Stash Location on August 19, 2021

116.    On August 19, 2021, at approximately 3:30 p.m., an agent established surveillance at **Garcia's Residence** and observed a black BMW sedan, a black Acura sedan, and a black pickup truck parked in the front yard of **Garcia's Residence.**[35] At approximately 4:41 p.m., an agent observed Garcia walk out of the garage area of **Garcia's Residence** carrying items in his arms and place them in the rear driver's side seat, however, the agent was unable to distinguish what those items were at this time. The agent then observed Garcia return to the garage, disappearing out of view. Moments later, the agent observed Garcia return to the black BMW sedan carrying clothing items, which he also placed in the rear driver's side seat. The agent then observed Garcia enter the driver's seat of the black BMW sedan and depart from the residence. Surveillance was then established on Garcia.

---

34 According to NV DMV, plate 609K52 is registered to Ean Holdings LLC at 14002 E 21st Street, Suite 1500, Tulsa, Oklahoma on a 2020 Ford 4-door sedan. Additionally, agents obtained information from Enterprise Holding, via administrative subpoena, and discovered that Jeffrey Manning, DOB: ███1969, was the current lessee on the Ford Fusion sedan bearing NV plate 609K52.

35 Agents have observed Garcia operating all of these vehicles on previous surveillances throughout the course of this investigation.

117.    At approximately 4:50 p.m., the agent observed Garcia's black BMW parked

under a carport directly in front of building 17 at the **Del Rio Stash Location.** The agent also

observed a black Nissan Titan pickup truck, a vehicle registered to Baca, parked several parking

spaces to the south of Garcia's vehicle. At this time, the agent observed Garcia sitting in the

driver's seat of the BMW. Approximately one minute later, the agent observed Garcia depart

from the **Del Rio Stash Location** and travel eastbound on Montano Road NW. Due to

Garcia maneuvering through traffic and driving at a high rate of speed, the agent lost visual of

Garcia as he traveled northbound on Pan American Freeway NE from Montgomery Boulevard

NE. Surveillance was then terminated on Garcia.

118.    Based on my training, experience, conversations with other law enforcement

investigators, and knowledge of the investigation, I believe Garcia continues to utilize the **Del**

**Rio Stash Location** to store illegal narcotics. Based on the short duration of time Garcia spends

at the **Del Rio Stash Location,** I believe Garcia is retrieving an unknown quantity of cocaine to

then distribute to a third-party.

**Surveillance of Garcia on August 27, 2021**

119.    On August 27, 2021, agents conducted surveillance on Garcia for the purpose of

continuing to observe Garcia's drug trafficking patterns. At approximately 1:05 p.m., agents

received a 3339-meter GPS location data for 505-550-0922 ("Garcia Phone 1") in the vicinity of

Latitude 35.084378, Longitude -106.598110. Agents have previously received similar GPS

locations for Garcia Phone 1 in this area and have observed Garcia frequent Jaime Morris's

("Morris") residence located at 5900 Alice Avenue NE, Unit #A5, Albuquerque, NM. [36] At

---

36 Utilizing law enforcement databases, agents observed that Jaime Morris most current address is 5900 Alice
Avenue, Unit #A5, Albuquerque, NM and is believed to be Garcia's paramour. Additionally, through toll analysis,
agents have learned that Jaime Morris is one of the top contacts of Garcia Phone 1.

approximately 1:15 p.m., agents observed Garcia's black BMW sedan bearing NM license plate UNM41664 driving northbound on Alvarado Drive NE from Alice Avenue NE, which is in the vicinity of Morris's residence. At this time, surveillance was established on Garcia's BMW.

120.    At approximately 1:32 p.m., agents observed Garcia's BMW travel westbound onto Sevilla Avenue NW from Coors Boulevard NW, however, agents were unable to maintain surveillance on the BMW at this time. Minutes later, agents re-acquired Garcia's BMW parked in the drive-thru line at the Rain Tunnel Car Spa located at 5401 Sevilla Avenue NW, Albuquerque, NM 87120. Agents observed Garcia's BMW travel through the car wash and then proceed towards the vacuum stall area. At this time, agents observed Garcia exit the driver's seat of the BMW and walk towards a nearby bench to sit and wait for his vehicle to be finished. At approximately 2:07 p.m., agents observed Garcia walk towards his BMW, enter the driver's seat, and depart from the car wash. Agents followed Garcia northbound on Coors Boulevard NW towards **Garcia's Residence.**

121.    At approximately 2:14 p.m., agents observed Garcia's BMW park in the driveway of **Garcia's Residence**. Agents observed Garcia exit from the driver's seat of the BMW and enter the residence through the opened garage door, disappearing out of view. A few minutes later, agents observed Garcia walk out of his residence, retrieve a ladder from the bed of a pickup truck, which was previously parked on the property of Garcia's Residence. Over the next thirty minutes, agents observed Garcia work on a light on the top right of his garage, with the use of the ladder. Afterwards, agents observed Garcia enter his garage and the garage door closed.

122.    At approximately 3:35 p.m., agents observed the garage door to **Garcia's Residence** open and Garcia exit from the garage, walking towards the driver's side of his black

BMW. Agents then observed Garcia enter the driver's seat of his BMW, close the door, and depart from his residence, traveling eastbound on Territorial Road NW.

123.    At approximately 3:42 p.m., agents observed Garcia arrive to the **Del Rio Stash Location**, traveling towards the north side of the property. Agents observed Garcia park on the north side of building 17, facing west. At approximately 3:45 p.m., agents observed a white Lexus sedan park behind Garcia's BMW, facing east. However, at this time, agents did not know this white Lexus was involved with this investigation. Approximately fifteen seconds after observing the white Lexus park, agents observed Garcia exit from the driver's seat of his BMW, close the door, and walk towards the breezeway entrance located on the east side of building 17. At this time, agents did not observe Garcia carrying anything in his hands as he walked towards building 17. Agents then observed Garcia walk to the left past the stairs on the lower level of building 17, disappearing out of view. As Garcia walked towards building 17, agents observed an unidentified male driver ("UM-5") of the white Lexus exit from the driver's side door, open the rear passenger door of the Lexus, and lean in. Shortly after, UM-5 closed the back passenger door and re-entered the driver's seat of the white Lexus. Meanwhile, agents observed Garcia walk towards the door to the **Del Rio Stash Location** located on the 1st floor of building 17, open the door to apartment 107, and enter, disappearing out of view.

124.    At approximately 3:46 p.m., agents observed Garcia exit from the **Del Rio Stash Location** closing the door behind him and appearing to lock the door. Moments later, agents observed Garcia exit from the lower level breezeway of building 17 on the east side, carrying a white plastic bag in his left hand. Agents could see that the plastic bag appeared to be weighted down. As Garcia approached his black BMW, agents observed UM-5 walk towards the

53

passenger side door of the black BMW. Agents also observed that UM-5 was carrying a black backpack in his right hand.

125.     At approximately 3:47 p.m., agents observed Garcia enter the driver's seat of his black BMW still carrying the white plastic bag. Agents also observed UM-5, who was carrying the black backpack, enter Garcia's front passenger seat. Approximately one minute later, agents observed UM-5 exit the front passenger seat of Garcia's black BMW. Agents observed UM-5 walk to the white Lexus and place the black backpack in the rear passenger seat. Seconds later, agents observed UM-5 enter the driver's seat of the white Lexus.

126.     At approximately 3:49 p.m., agents observed Garcia's BMW back out of its parking spot and travel towards the exit of the apartment complex. A few seconds after Garcia's BMW backed out of its spot, agents also observed the white Lexus back out of its parking spot and follow Garcia's black BWM towards the exit. As the white Lexus was departing from the apartment complex parking lot, agents obtained the license plate for the white Lexus bearing NM plate BBBK50.[37]

127.     Agents maintained surveillance on Garcia and followed him to the area of "Old Town Albuquerque" located in the vicinity of Rio Grande Boulevard NW and Mountain Road NW.  Agents observed Garcia park his BMW in a parking lot next to 324 San Felipe Street NW, Albuquerque, NM. At this time, agents observed Garcia exit the driver's seat, carrying a light colored plastic bag. Agents observed Garcia walk towards the businesses located inside a

---

37 According to NM DMW, plate BBBK50 is registered to EXETER Finance LLC and to Brandy Rose Martinez, DOB: ███1993, at 1304 Dallas Street NE, Albuquerque, NM 87110 on a white 2017 4-door Lexus sedan.

courtyard within 324 San Felipe Street NW. Other surveillance agents walked on foot inside the courtyard and observed Garcia was inside the business "Step in Style Huaraches".[38]

128.    At approximately 4:21 p.m., agents observed Garcia exit from "Step in Style Huaraches," carrying a white gift bag, and walk out of the courtyard, disappearing out of view. Seconds later, agents observed Garcia walk back inside the courtyard and enter "Step in Style Huaraches," still carrying the white gift bag.

129.    At approximately 4:33 p.m., agents observed Garcia exit from "Step in Style Huaraches," carrying a white gift bag, and walk out of the courtyard towards his black BMW. Agents observed Garcia enter the driver's seat of the BMW and subsequently back out of the parking space. Agents then followed Garcia back to Morris' residence located at 5900 Alice Avenue NE, where he arrived at approximately 4:42 p.m. Agents observed Garcia park his BMW in a parking lot located to the south of Morris' residence. Agents observed Garcia exit the driver's seat of his BMW carrying the same white gift bag he was observed carrying from "Step in Style Huaraches." Agents observed Garcia walk across the street north and through a fence to a breezeway where unit #A5 is located, disappearing out of view. At approximately 4:45 p.m., surveillance on Garcia was terminated.

130.    Based on my training, experience, knowledge of the investigation, and the pattern of events that transpired throughout the surveillance of Garcia on this date, I believe Garcia retrieved an unknown quantity of illegal drugs from the **Del Rio Stash Location** and distributed the illegal drugs to UM-5 inside Garcia's vehicle. Based on the brief interaction Garcia had with UM-5 after visiting the **Del Rio Stash Location** and UM-5 entering Garcia's vehicle with a

---

38 Per reliable CS-1 statements, agents have identified a business owned by Garcia and his family named "Step in Style Huaraches" located at 324 San Felipe Street NW Albuquerque, NM, which is in "Old Town Albuquerque".

black backpack, I believe these are all actions consistent with drug trafficking. It is my belief that Garcia continues to utilize the **Del Rio Stash Location** to store illegal narcotics.

131.     Based on all facts outlined in this affidavit, there exists probable cause to believe the GARCIA DTO was involved in drug trafficking activities, and has used, and will continue to use, the **SUBJECT PREMISES** to store drugs, drug proceeds, and evidence of the federal crimes discussed herein.  Further, it is my training and experience that drug trafficking organizations will continue to commit drug trafficking offenses until they are apprehended by law enforcement, and therefore, I believe the GARCIA DTO continues to distribute illegal drugs in the Albuquerque, NM area.

## CONCLUSION

132.     I submit that this affidavit supports probable cause for a warrant to search the **SUBJECT PREMISES** described in Attachment A and seize the items described in Attachment B.

133.     This affidavit has been approved by AUSA Peter J. Eicker.

I swear that this information is true and correct to the best of my knowledge and belief.

*Gillian Polinko*
GILLIAN M. POLINKO
Special Agent
Drug Enforcement Administration

Subscribed and sworn telephonically and signed electronically on this 7th day of September, 2021,

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE

56

## <u>ATTACHMENT A</u>

*Property to be searched*

The property to be searched is 5309 Territorial Road NW, Albuquerque, New Mexico 87120 **("Garcia's Residence"),** further described as a single-story residence constructed of wood frame and stucco. The residence is brown in color stucco with a flat rooftop and has a black metal security door.  The front door of the residence faces south and "5309" is displayed in black numbers to the left of the front door, below a porch light. The garage of the residence is two car garage and is white in color and also faces south. Photographs of **Garcia's Residence** is included below:



The search of the above **Garcia's Residence** shall include the search of the entire residence, all attached and unattached garages, and storage areas/containers (including mailboxes and trash cans) on the **Garcia's Residence**, and all persons located in the **Garcia's Residence** in or on which the items to be seized could be concealed.  The search shall also include all vehicles parked at, or in front of, the **Garcia's Residence** that have an apparent connection to the **Garcia's Residence** and/or the residents of the **Garcia's Residence**. Connection to the vehicle may be established by evidence that anyone residing at the **Garcia's Residence** own, operate, and/or have access to any vehicle parked at or in front of the **Garcia's Residence.** Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

## ATTACHMENT B

### *Property to Be Seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 841, 21 U.S.C. § 846, and 21 U.S.C. § 856, committed by Jeffrey Manning, John Allison, Leonardo Garcia, Derek Baca and/or any co-conspirators ("the SUBJECTS"), including:

1. Controlled substances such as fentanyl, oxycodone, methamphetamine, heroin, cocaine, and marijuana.

2. Drug paraphernalia such as scales, packaging materials, items for packaging, processing, and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

8.  Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

9.  Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.

16. Property constituting evidence of the commission of the criminal offenses of 21 U.S.C. § 841, 21 U.S.C. § 846, 21 U.S.C. § 856, and 18 U.S.C. § 2; contraband, and property designed and intended for use as the means for committing the criminal offenses of 21 U.S.C. § 841, 21 U.S.C. § 846, 21 U.S.C. § 856, and 18 U.S.C. § 2; as well as paraphernalia used to prepare controlled substances for distribution and personal use.

17. Any and all computers and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

During the execution of the search of the **Garcia's Residence** described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any

individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.